FILED
United States Court of Appeals
Tenth Circuit

April 13, 2017

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

BRYAN JAMES MURPHY,

Defendant - Appellant.

No. 16-5118
(D.C. No. 4: 15-CR-00101-JED-1)
(N.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **LUCERO**, **O'BRIEN**, and **MORITZ**, Circuit Judges.

Rarely do we see obdurate misbehavior on this scale. Bryan James Murphy has a

history of impersonating police officers and other authority figures. Unfortunately, his

demonstrated desire for control over others is exacerbated by his refusal to control his

---

[*] After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore submitted without oral argument.

This order and judgment is an unpublished decision, not binding precedent. 10th Cir. R. 32.1(A). Citation to unpublished decisions is not prohibited. Fed. R. App. 32.1. It is appropriate as it relates to law of the case, issue preclusion and claim preclusion. Unpublished decisions may also be cited for their persuasive value. 10th Cir. R. 32.1(A). Citation to an order and judgment must be accompanied by an appropriate parenthetical notation – (unpublished). *Id.*

own unacceptable behavior. His unwillingness to reform and his disregard of court orders led to the revocation of his supervised release. That resulted in 11 months in prison followed by a new term of supervised release, which included 6 months of home curfew with electronic monitoring. He claims the sentence is substantively unreasonable. He is mistaken. In light of his persistently deplorable behavior, the sentence is eminently reasonable.

## I. Background

The procedural history in this case is convoluted. Nevertheless, detailing Murphy's serial transgressions opens a window revealing his attitude, if not his character.

### A. *False Statement to Federal Agency*

On August 13, 2014, Murphy applied to be an aircraft fueler at the Tulsa International Airport. As part of the application process, he applied for a Security Identification Display Area badge with the Transportation Security Administration, better known as TSA. The badge would have given him unrestricted access to the aircraft operating area. On his application for the badge, he lied three times: (1) he provided a false social security number; (2) he indicated he did not have any prior felony convictions involving dishonesty, fraud, or misrepresentation but, truth be told, he had just been convicted of a felony in May 2014 for impersonating a public officer by uniform or vehicle; and (3) when asked whether he had previously used another name, he failed to report his recent name change from Bryan Sebesta to Bryan Murphy. His lies did not go undetected.

- 2 -

On May 29, 2015, the government charged him with knowingly and willfully making false statements to a federal agency in violation of 18 U.S.C. § 1001. A month later, the district judge released him on a $5,000 bond. As a condition of his pretrial release, he agreed "not [to] possess a firearm, destructive device, or other dangerous weapon." (Supp. R. Vol. II at 14.)

### B. Guilty Plea and Conduct while on Pretrial Release

On July 28, 2015, he pled guilty to the false statement offense. At the change of plea hearing, the government asked the judge to modify the conditions of pretrial release based on his recent possession of a pepper-ball gun while working as an unlicensed security officer. The judge did so, prohibiting him from "possess[ing] a firearm or anything that resembles a firearm" including a pepper-ball gun. (Supp. R. Vol. II at 26.) Those words went twisting in the wind.

A month later, on August 29, 2015, a police officer found Murphy carrying a pepper-ball gun in a holster while working as a security guard at an apartment complex. It gets worse. A few weeks later, while working as a security guard at a mobile home park, he stopped a vehicle with a broken tail light. When the driver became angry and threw a bottle of liquid at him, he retaliated by tasing the driver several times, taking him to the ground, and placing him in handcuffs.[1]

---

[1] This was not the first time Murphy exceeded the bounds of reasonable behavior. On July 26, 2015, two days before he pled guilty, he unsuccessfully attempted to stop a vehicle belonging to a car dealer (the car dealer did business with the auto auction where Murphy worked as a security guard). He then called the dealer, identifying himself as "a

(Continued . . .)

These incidents led the judge to modify the conditions of release once again. This time, with Murphy's consent, he was prohibited from "work[ing] directly or indirectly in any business, profession, self-employment, or contract employment engaged in security services or similar activities." (Supp. R. Vol. II at 31.) It was all in vain. Ten days later, on November 7, 2015, police observed Murphy driving a vehicle containing a flashing emergency light bar on its roof, the word "SECURITY" on both of its sides, and a red sticker with a picture of a dog indicating it was a K-9 unit. Murphy claimed to be driving the vehicle only because his other car was not working. His clothing indicated otherwise—he was wearing black tactical pants and boots and carrying a pocketknife.

*C. Sentencing on False Statement Offense*

The presentence report calculated a base offense level of six. USSG § 2B1.1(a)(2). After a two-level downward adjustment for acceptance of responsibility, USSG § 3E1.1(a), the total offense level was four. In addition to his 2014 conviction for impersonating a public officer by uniform or vehicle, Murphy's criminal history included convictions for: (1) illegally possessing blue or red emergency lights, (2) unlawfully possessing a weapon, (3) impersonating a police officer, and (4) working as an Emergency Medical Technician (EMT) without proper certification. This criminal history, along with the commission of the false statement offense while on state court

---

sheriff" from Pryor, Oklahoma, and stating he was going to put the dealer in jail for repossessing a vehicle. (R. Vol. II at 9.) It got worse. He went to the dealer's business, this time identifying himself as a detective. He threatened to place the dealer in jail, revoke his dealer's license, and ban him from auto auctions.

probation, resulted in a Criminal History Category of III. The violations of the court's pretrial release order were not factored into the history score. The advisory guideline range was 0 to 6 months imprisonment.

After considering the sentencing factors outlined in 18 U.S.C. § 3553(a), the judge sentenced Murphy to 4 months in prison to be followed by a three-year term of supervised release. He noted Murphy's "shocking" conduct on November 7, which occurred shortly after agreeing not to engage in security work. (Supp. R. Vol. I at 69.) He also expressed his concern over the nature of the offense conduct—attempting to gain access to secure areas of an airport. Finally, he emphasized how Murphy's "criminal history and conduct while on pretrial release reflect an unwillingness to abide by the law and cease portraying himself as holding a position of authority." (*Id*. at 75.)

### D. Conduct on Supervised Release

With four months of incarceration completed, Murphy began serving his supervised release on April 15, 2016. Shortly thereafter, his probation officer learned that he and his fiancé had continued operating a security company while he was incarcerated, a violation of prison rules. On April 22, 2016, the judge modified the conditions of supervised release, again with his consent, to prohibit him from working in security.[2] Nonetheless, the pattern continued.

On May 7, 2016, Murphy, clothed in tactical gear and carrying what looked like a

_____

[2] Whether intentional or inadvertent, the conditions of Murphy's supervised release (as opposed to those of his pretrial release) did not prohibit him from working in the security field.

gun, was found working as a security guard at a mobile home park. When asked about the incident, Murphy denied working as a security officer.[3] Citing both incidents, the probation officer filed a petition seeking to revoke his supervised release.

*E. Revocation of Supervised Release and Sentencing*

After Murphy admitted to the violations, the judge revoked his supervised release and the probation officer prepared a sentencing memorandum. The advisory guideline range was 5 to 11 months imprisonment.

The government requested a sentence at the top of the range (11 months) due to Murphy's repeated failure to heed the court's directives. Murphy's attorney, on the other hand, argued there is obviously "something not quite right [with Murphy's] psyche," making prison an inappropriate response. (R. Vol. II at 25.) His recommendation was basically more of the same—Murphy should be continued on supervised release with stricter conditions such as ankle monitoring and home confinement with psychological treatment.

The judge decided 11 months in prison was "appropriate and necessary." (R.Vol. II at 29.) He cited in detail Murphy's noncompliance with the requirements of pretrial release, noting he "has not taken . . . the court or his supervision seriously . . . ." (*Id*.) He emphasized that "[c]ommunity supervision has proven to be ineffective in aiding Murphy to understand the importance of following the court's directives. Having not been

_____

[3] In addition to agreeing not to work in the security field, another condition of Murphy's supervised release required him to "answer truthfully all inquiries by the probation officer." (Supp. R. Vol. II at 34.)

subjected to a lengthy period of incarceration as punishment for his [past] criminal activity, a more lengthy sentence of imprisonment may serve as a more effective deterrent . . . ." (*Id.*) He reasoned:

> Both the court and the probation office have exhausted methods and modifications to address [Murphy's] noncompliance; however, [he] has not shown a desire to change his behavior. The incidents that occurred on pretrial release during his incarceration and post release are of great concern to the court, as the defendant has portrayed himself as a law enforcement entity and placed both himself and the community in danger.

(*Id*. at 30-31.)

In addition to the term of imprisonment, the judge imposed a 24-month term of supervised release. Among the special conditions of supervised release, the judge required he:

> be placed on remote location monitoring on home curfew for a period of six months to commence within 72 hours of release. During this time, the defendant shall remain at his place of residence during hours determined by the probation officer. The defendant shall maintain a telephone at his place of residence without call forwarding, a modem, caller ID, answering machine, call waiting, or portable cordless telephones for the above period. The defendant shall wear an electronic monitoring device and follow electronic monitoring procedures specified by the probation officer.

(*Id*. at 32-33.)

## II. Discussion

Murphy sees his sentence as "unreasonably harsh" and therefore substantively unreasonable. (Appellant's Br. at 6.) He doesn't deny that an 11-month sentence, standing alone, would probably have been reasonable. In fact, he admits his "conduct on supervised release may have warranted additional prison time." (*Id*. at 7.) Nor would the

- 7 -

imposition of a curfew have been unreasonable. However, the combination of the two, he claims, was too much.

"We review all sentences, including those imposed for violations of supervised release, for reasonableness. Substantive reasonableness involves the length of the sentence imposed and is reviewed under an abuse-of-discretion standard." *United States v. Rausch*, 638 F.3d 1296, 1302 (10th Cir. 2011) (citation omitted), *overruled on other grounds by United States v. Bustamonte-Conchas*, 850 F.3d. 1130 (10th Cir. 2017). The abuse of discretion standard requires "substantial deference" to the sentencing judge's decision; we will deem a sentence unreasonable only if it is "arbitrary, capricious, whimsical, or manifestly unreasonable." *United States v. Landers*, 564 F.3d 1217, 1224 (10th Cir. 2009) (quotation marks omitted).

Because Murphy's sentence was within the range suggested by the Sentencing Commission's policy statements, it is presumptively reasonable. *United States v. McBride*, 633 F.3d 1229, 1233 (10th Cir. 2011). He may rebut the presumption "by demonstrating the sentence is unreasonable in light of the other factors laid out in 18 U.S.C. § 3553(a)." *Id*. (quotation marks omitted). In the district court (and even now) he failed miserably, offering little more than tired argument.

He claims home detention to be "a very restrictive condition":

> A supervisee on home detention may leave the confines of his home only with the permission of his probation officer. The supervisee's ability to engage in everyday activities, such as visiting friends and family or running errands is severely curtailed, at least without a probation officer's approval. Thus, while certainly preferable to imprisonment, home detention involves a degree of captivity that substantially exceeds the run-of-the-mill condition of supervised

release.

(Appellant's Br. at 6-7.)

However, the judge imposed curfew, not home detention.[4] Murphy is restricted to his home only "during evening and nighttime hours." USSG § 5D1.3(e)(5). That distinction aside, a combination of prison and a curfew condition is reasonable in light of the § 3553(a) factors. As the judge noted, a lengthy term of imprisonment was necessary because the previous period of imprisonment (only 4 months) had not been an adequate deterrent. The judge was also much concerned with the extent and nature of Murphy's noncompliance with supervision. His serial noncompliance made a gradual transition from incarceration to release not only advisable, but also necessary.

---

[4] According to Murphy, curfew only requires the defendant be at home "during evening and nighttime hours." USSG § 5D1.3(e)(5). Yet the condition imposed requires him to remain at home "during hours determined by the probation officer." (R. Vol. II at 32.) He also points out that home detention should "ordinarily" be enforced through use of electronic monitoring, which the judge imposed. *See* USSG § 5F1.2, comment. (n.1). We see the argument as a distinction without a difference.

Although electronic monitoring is "ordinarily" used with home detention, this case is far from ordinary (as we have taken pains to demonstrate). Moreover, it "may be used as a means of surveillance to ensure compliance with a curfew order." USSG § 5D1.3(e)(5).

The guidelines distinguish between "[h]ome detention" and "curfew," USSG § 5D1.3(e)(2), (e)(5), something the judge clearly understood. With the difference in mind, he imposed "home curfew." (R. Vol. II at 32.) The obvious purpose was to maximize success on supervised release by maintaining structure in Murphy's life.

Taken in context, the probation officer was left to decide which "evening and nighttime hours" Murphy would have to be at home—the essence of a curfew.

**AFFIRMED**.

Entered by the Court:


**Terrence L. O'Brien**
United States Circuit Judge